[No. 24386. Department Two. September 18, 1933.]

J. L. SNYDER, *Respondent*, v. YAKIMA FINANCE
CORPORATION, *Appellant*.[1]

[1]Reported in 25 P. (2d) 108.

500

*Joseph C. Cheney* and *Elwood Hutcheson,* for appellant.

*Grady & Velikanje, Stanley P. Velikanje,* and *Cherry & Hull,* for respondent.

TOLMAN, J.—This action was brought to recover on a promissory note and to have a receiver appointed for the corporation maker thereof.

The complaint contained the usual allegations regarding the execution, delivery, maturity and nonpayment of the note. As a basis for the appointment of a receiver, the complaint alleged that the defendant was insolvent; that the defendant held a large number of unpaid stock subscriptions; that its trustees had unlawfully paid dividends out of its capital; that no attempt had been made by the defendant either to collect such stock subscriptions or to enforce the liability of the trustees for the unlawful payment of dividends; that, had the defendant done so, it would have been able to pay its indebtedness; that the defendant had surrendered its business and affairs to a trust company for liquidation and had thereupon ceased to do business; and that, unless the unpaid stock subscriptions were collected and the liability of the trustees enforced, the plaintiff and others similarly situated would sustain a severe financial loss.

The answer admitted the allegations concerning the note, but denied all allegations with reference to the grounds for the appointment of a receiver. By way of an affirmative defense, the answer alleged that the note was given in renewal of a former unsecured note; that, to secure the renewal note, together with others of a similar kind, the defendant had, by chattel mortgage, pledged a large amount of securities, and had, by deed, conveyed certain real estate to Guaranty Trust Company, as trustee; that, pursuant to the execution

of those instruments, the trust company in turn had executed its declaration of trust; that the trust arrangement had been made with the full knowledge and consent of the plaintiff and other note holders similarly situated; that the trust was being properly administered and that the assets of the defendant were being liquidated thereunder; that the note holders, including plaintiff, had been paid dividends to the extent of thirty per cent upon their notes; that plaintiff, with six other note holders, had previously instituted an action similar to, and upon the same allegations as those contained in, the present action, and that that action had been dismissed; that, by reason of the premises, plaintiff was estopped and barred from maintaining this action. The affirmative matter contained in the answer was denied in the reply.

From a judgment awarding recovery on the note and appointing a receiver for the defendant, the latter has appealed. The plaintiff is therefore the respondent here, and the defendant becomes the appellant.

The facts of the case, as shown by the evidence, are these: Appellant, Yakima Finance Corporation, was incorporated in this state in 1920, and thereafter engaged in a general finance business at Yakima for about ten years. Its capital stock of five hundred thousand dollars was divided into ten thousand shares of the par value of fifty dollars each, one-half of the stock being common stock and the other half being preferred stock. For the purpose of assisting in the sale of the stock, an affiliate corporation was organized. The stock was to be disposed of under a plan whereby single units, each consisting of two shares of preferred and one share of common stock, were to be sold for $125 per unit. Of the five thousand shares of common stock, twenty-five hundred shares were sold under the unit plan. The other twenty-five hundred shares

were divided between the affiliate corporation and the trustees of the appellant. The money realized from the sale of the twenty-five hundred shares of common stock under the unit plan was paid over to the affiliate corporation on account of services rendered. The stock which was to be divided between the affiliate corporation and the trustees of the appellant was held in escrow until the year 1925, and then distributed.

The consideration for the cash paid to the affiliate corporation and for the twelve hundred fifty shares of common stock ultimately delivered to it, consisted of services rendered by the affiliate corporation and by its payment of all expenses and commissions incurred in the sale of the stock in units, and all expenses of operation of the appellant until it was fully capitalized and had sufficient money on hand to pay the first quarterly dividend on the common stock. The trustees, originally five and later fifteen in number, gave for their stock their services as such and paid the expenses of organization of the appellant corporation.

Whether the consideration for the ''promotion stock,'' so-called, was adequate or inadequate does not clearly appear from the evidence. At any rate, it was obviously the purpose of the promoters and organizers of the appellant that it should be capitalized through the sale of its preferred stock and a certain portion of its common stock, and that the remainder of the common stock should go to them for their services and expenditures in its behalf. Financial statements, showing that two hundred fifty thousand dollars of the capital stock was carried as donation stock, were sent to the United States revenue department, to the secretary of state of Washington, and to the various stockholders, and were regularly published in the press.

After its organization, the appellant transacted a fairly substantial and profitable business until 1930,

but in the early part of that year it began to meet with financial reverses.

On March 30, 1926, the appellant, desiring to deal in collateral trust obligations, had executed to Guaranty Trust Company of Yakima a collateral trust deed agreement pledging certain securities for the purpose of securing its collateral trust notes and bonds thereafter issued.

Dividends were paid to stockholders as late as September, 1929.

Between May 16, 1929, and January 21, 1930, respondent had made loans to the appellant aggregating $11,500, for which he took, and held, appellant's thirty-day demand notes, without security. Other individuals had similar transactions with the appellant, the aggregate of which totaled about $59,000 in amount.

In May, 1930, appellant became, and ever since has been, insolvent. In order to avoid the possibility, or probability, of a receivership or of bankruptcy proceedings, the officers of the appellant conceived and formulated a plan whereby appellant was to issue and deliver to all general, unsecured creditors, in lieu of their demand notes, its series "B" notes, bearing interest at the rate of seven per cent per annum, payable two years after date. To secure these notes, the appellant was to execute to Guaranty Trust Company, as trustee, deeds to certain real estate, and also a chattel mortgage covering certain personal property, the two instruments to constitute a pledge of all the assets of the appellant not previously pledged by the collateral trust agreement. Under this plan, the trust company was to liquidate the pledged assets, consisting principally of conditional sales contracts, chattel mortgages, notes and accounts receivable, automobiles, musical instruments, and certain other personal property and also some real estate, and, after the payment of its ex-

penses, to disburse the proceeds in dividends to the creditors upon their series "B" notes.

A meeting of the creditors of the appellant was called in the early part of May, and the plan and the reason therefor were explained to them. The respondent was present at that meeting. As a result of the conference, the plan above outlined was adopted and made effective. The respondent received, in lieu of his demand notes, a series "B" note dated May 2, 1930, for $12,777.37, representing the principal and interest then due and owing to him. The other unsecured creditors received similar notes. The chattel mortgage and deeds, given to secure the notes, were executed and duly filed for record. Thereafter, on June 27, 1930, a declaration of trust was executed, defining the purposes of the trust and prescribing the powers and duties of the trustee.

In pursuance of the trust arrangement, the Guaranty Trust Company entered upon, and has ever since been engaged in, the liquidation of the assets which were turned over to it for that purpose. The holders of the series "B" notes have received dividends totaling thirty per cent of their claims. Unfortunately, however, the period of liquidation has extended beyond the time originally thought to be sufficient for its completion, and the process, though continuous, has admittedly been a slow one.

Sometime in 1931, and prior to the maturity of the series "B" notes, respondent and six other holders of such notes brought an action against appellant for the appointment of a receiver. A demurrer to the complaint therein was sustained, and thereafter the action was dismissed without prejudice.

On May 12, 1932, after the series "B" notes became due, and while the liquidation was still in progress, this action was begun by respondent to recover the

balance due and owing him. The result of the trial, as already stated, was a recovery on the note in favor of respondent, and the appointment of a receiver for appellant. In his oral decision at the conclusion of the evidence, the trial judge stated that, in his opinion, he was not called upon to pass on the question of the stockholders' liability for unpaid subscriptions, or upon the question of the trustees' liability for unlawful distribution of dividends, but that the only question before the court was whether respondent was entitled to have a receiver appointed for appellant. The gist of the court's oral decision is contained in the following statement:

"I have but the one question, it seems to me, for disposition and that is, is he entitled likewise to have a receiver appointed, it being admitted that the corporation is insolvent. They have disclosed it was insolvent on May 2nd, 1930, not by reason of liabilities exceeding its assets, but it wasn't meeting its current obligations in due course of business, and this whole matter was entered into to enable it to discharge its obligations.

"It appears beyond dispute that the plaintiff has been a beneficiary under this declaration of trust agreement. The plaintiff and other creditors situated as he is, however, in no manner became parties to these instruments by the execution of them. It was only by some oral agreement, or a course of conduct, that would raise an implication of contractual responsibility. But to this court it is very evident that the defendant corporation and the Guaranty Trust Company, as well as the unsecured creditors, in May, 1930 were very sanguine concerning future possibilities and felt certain that within a short time the situation would be cleared up. The economic situation that has come on caused their plans to miscarry. In two years only thirty per cent has been discharged. No definite arrangement has been made for the administration of the trust."

The only basis, in the findings, for the appointment of a receiver was the insolvency of the appellant. It may be observed that there was no allegation of fraud contained in the complaint and no finding of fraud made by the court. In fact, we are satisfied that no finding of fraud could have been made based on the evidence that was adduced.

The assignments of error, five in number, present but one question, namely, whether respondent was entitled to maintain the action upon the note and for the appointment of a receiver. Discussing these assignments and the question raised thereby, appellant makes three contentions: (1) that respondent, a mere note holder, can not, under the terms of the chattel mortgage and declaration of trust, maintain this action; (2) that respondent is precluded from maintaining the action by estoppel, waiver, laches and ratification; and (3) that respondent could in no event benefit from the receivership.

Appellant prefaces its discussion of these contentions with the statement that the appointment of a receiver is an extraordinary, harsh and drastic remedy, and is therefore to be exercised with the greatest caution and only where there is no other adequate remedy. In support of that doctrine as stated by appellant, the following cases from this jurisdiction are cited: *Smith v. Brown,* 50 Wash. 240, 96 Pac. 1077; *Bergman Clay Mfg. Co. v. Bergman,* 73 Wash. 144, 131 Pac. 485; *Norris v. Anderson,* 134 Wash. 403, 235 Pac. 966; *Gahagan v. Wisner,* 139 Wash. 664, 247 Pac. 965; *Horejs v. American Plumbing etc. Co.,* 161 Wash. 586, 297 Pac. 759.

Those cases, while correctly decided, are not applicable here, because in none of them was an insolvent corporation involved. It is the rule in this state that it becomes the duty of the court to appoint a receiver

of an insolvent corporation whenever an interested party asks for such action on its part, and establishes the fact of such insolvency to the satisfaction of the court. *Oleson v. Bank of Tacoma,* 15 Wash. 148, 45 Pac. 734; *New York National Exchange Bank v. Metropolitan Bank,* 28 Wash. 553, 68 Pac. 905; *Davis v. Edwards,* 41 Wash. 480, 84 Pac. 22; *Blum v. Rowe,* 98 Wash. 683, 168 Pac. 781; *Biehn v. Aetna Investment Co.,* 110 Wash. 460, 188 Pac. 489; *Smith v. Solomon Valley Dredging Co.,* 147 Wash. 69, 264 Pac. 1009. This is the rule in the absence of any question of estoppel.

Appellant's first main contention is that respondent, a mere note holder, can not maintain this action, but must seek his relief through the medium of the trustee. Appellant takes the emphatic position that, by and because of the provisions of the chattel mortgage and the declaration of trust, the trustee only may maintain the action.

An examination of those instruments does not support that contention. The note is a negotiable instrument. It does not bear upon its face, or anywhere by endorsement, any restriction whatever against the commencement of an action thereon by the holder. Nor does it contain any reference to the other instruments. The chattel mortgage, it is true, refers to, and incorporates into it, the declaration of trust, but does not within itself contain any affirmative restriction against an action by the individual note holder. The declaration of trust contains the following provision, on which appellant relies:

"It is further understood and agreed that in the event Trustor shall during the life of this agreement be forced into involuntary bankruptcy and said chattel mortgage be declared invalid, or should any other successful attack be made upon said chattel mortgage or

this agreement by general creditors which shall result in invalidating said chattel mortgage, then the said creditors holding Series "B" notes shall be entitled to declare said notes immediately due and payable, notwithstanding the fact that said notes are payable on or before two years from May 2, 1930, and said creditors shall be entitled to pursue any legal remedy which they may have for the collection of their claims."

It will be observed that, while this provision permits the acceleration of the maturity of the note upon certain contingencies, it does not restrict the note holder in his common-law or statutory rights of action. It is the rule that, where a series of negotiable notes or bonds are held by various individuals and are secured by a trust mortgage, or deed of trust, if the notes or bonds contain no restriction, either directly or by proper reference to the trust mortgage or deed of trust, against an action thereon, then such holder may maintain a separate action without reference to the provisions of the trust instrument, regardless of the restrictions therein which might be otherwise binding.

The recent case of *Moody v. Pacific Steamship Co.*, *ante* p. 256, 24 P. (2d) 609, discusses the principles applicable to similar and correlative situations. In that case, an individual bondholder sought to maintain a separate action, but was not permitted to do so, because, as it was therein held, the note contained, by reference to the mortgage, a restrictive provision against such action. That is not the situation here, and hence the rule of that case, and of the cases relied on by appellant, does not apply in the present instance.

The appellant next contends that the respondent is precluded from maintaining this action by estoppel, waiver, laches and ratification. These various grounds all rest upon the asserted acquiescence and approval by respondent of the plan under which the liquidation is now being carried on.

The unsecured note holders, of whom respondent was one, of course knew that the corporation was in financial difficulties, but it is doubtful, to say the least, if respondent then knew it to be insolvent. It is quite evident that he did not then know of its other possible assets, such as the liability of stockholders and the like, which were not pledged to the trustee to secure the note holders.

Respondent did not propose the plan or induce others to act upon it. He merely acquiesced in the plan proposed by those who controlled the corporation, and his assent or acquiescence did not, so far as we can see from the record before us, induce them to do any act or take any step that would not have been done or taken if his consent had been withheld. While he may be estopped as to the liquidation already accomplished prior to the bringing of this action, we can see no reason for holding that he is estopped as to any assets still to be liquidated.

In any event, the plan did not result in the payment of the notes at or before their maturity, and we see no reason why thereafter he was not as free to proceed as he would have been had he never consented to the extension and trustee proceedings.

The primary purpose of the receivership here sought is to reach and make available to all creditors those assets of the corporation not pledged to the trustee and which the trustee has no power or legal right to collect. Without a receiver, such assets, if they exist as alleged, will be wholly lost to the creditors of the corporation. With a receiver, all such claims can be properly adjudicated in an orderly manner.

The third contention, that respondent can in no event benefit from a receivership, has, we think, been answered by what has already been said; but in any event, the receivership is for the benefit of all creditors

of the corporation, and we are not now called upon to determine who may and who may not participate in the dividends, if any.

The corporation is shown to have been insolvent. There is a showing that assets exist which can only be collected by a receiver, and the trial court was clearly right in appointing a receiver.

The judgment is affirmed.

BEALS, C. J., MAIN, and BLAKE, JJ., concur.

STEINERT, J. (dissenting)—Accepting the statement of the case as set forth in the prevailing opinion, I am utterly unable to agree with the conclusion therein reached. I am convinced that the respondent is, by his own acts and conduct, estopped from maintaining an action for the appointment of a receiver, except to the limited extent hereinafter indicated.

It will be observed that the sole basis for the appointment of a receiver in the present instance is the insolvency of the appellant; there is no element of fraud whatever in the case. The majority opinion frankly states:

"The only basis, in the findings, for the appointment of a receiver was the *insolvency* of the appellant. It may be observed that there was *no allegation of fraud contained in the complaint and no finding of fraud made by the court. In fact, we are satisfied that no finding of fraud could have been made based on the evidence that was adduced.*" (Italics mine.)

Proceeding from this setting of the case, it is to be noted that the plan under which appellant's business is now being administered and its assets liquidated, was adopted at a meeting of the creditors called for the specific purpose of considering such plan; that the respondent, who was the largest unsecured creditor,

was present at, and participated in, the meeting; that he acquiesced in, and agreed to, the plan as proposed and adopted; and that he has accepted dividends under the trust arrangement and has in every way shared ratably with all other creditors in the fruits and results of the present operation.

With reference to respondent's knowledge of appellant's financial condition at the time that the plan was adopted, and his attitude toward the prospective arrangement, he testified as follows:

"Q. Did you have a general conversation about what the meeting was about? A. I realized what it was about without asking. Q. How did you realize that? A. They turned it over to the Trust Company. Q. You had heard that the Finance Company on account of the yield on some investments were not in very good condition? A. I had made application to the company for I believe it was $2000—$1000 or something, about thirty days before they closed. Q. (The Court) That is before this May meeting? A. Yes. A little later, before the thirty days was up, Mr. Grommesch called me by phone and told me they were having a meeting about the tenth, as I remember, of May. Somebody told me they were getting in pretty bad straits, and I thought I would get my money if I could. Q. You heard rumor it was in pretty bad shape and you were trying to get your money out? A. Yes. Q. Whatever happened at the meeting or after the meeting, you agreed to take this new note which was to be secured by the property to be turned over to the Guaranty Trust Company? A. I agreed to take this note in place of the other notes. I think there was five or six, probably eight or nine of the other notes. I think they were in $1,000 amounts, the other notes, and they gave me this one note and taken up others with the interest added on the others. Q. You were to get interest on principal and interest in the future? A. Yes. Q. And you were to get your money from the Guaranty Trust Company? A. I was told the Guaranty Trust Company would liquidate the notes or take up the notes.''

The evidence also discloses, without contradiction, that, immediately after the creditors' meeting, respondent and one of appellant's officers further discussed the matter of a possible receiver for appellant, and that respondent then emphatically expressed himself in favor of the proposed trust arrangement in order to avoid such a receivership. It also appears from the evidence, without contradiction, that the very fact that respondent, who was the largest single unsecured creditor, had agreed to the plan, was used to induce other creditors of the same class to give their consent to its adoption.

The sum and substance of the matter is that respondent, when he became advised of appellant's insolvent condition, feared receivership and the consequent loss that might be thereby entailed; that he was convinced, as were the other creditors, that the plan suggested afforded the best means for his and their protection, and therefore approved it; that, with the support afforded by respondent's joining in the arrangement, the appellant, through its officers, was enabled ultimately to get the unanimous consent of the unsecured creditors to the adoption and perfection of the trust arrangement. The majority say in the prevailing opinion that the respondent did not propose the plan or induce others to act upon it, but merely acquiesced therein. The fact is, as I have already stated, that he consented to it after full knowledge of its necessity and its effect. Though he may not have actively induced others to act upon the plan, the fact remains that his consent led others to join in the plan.

No contention is made that the affairs of the corporation under the trust arrangement, so far as they have gone, have not been conducted as wisely, expeditiously and economically as circumstances and existing conditions would permit. It is true that the plan has

not worked out as successfully or as rapidly as was hoped in the beginning, but that is not chargeable to the fault of anyone. The difficulties attendant upon financial liquidations at the present time are too well known to call for further comment. No one will assert, I think, that a receivership is a specific for the cure of financial difficulties. The only question here is whether respondent may now repudiate a transaction to which he gave his consent, and by his repudiation disrupt the very proceedings to which he originally consented, and in the benefits of which he has ratably shared.

The doctrine of equitable estoppel has been variously defined. The following statement is set forth in 10 R. C. L., p. 689, as constituting the sum of all the cases:

"That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon."

In *Peterson v. Bergman Cabinet Mfg. Co.*, 145 Wash. 664, 261 Pac. 381, 55 A. L. R. 989, this court, speaking through Judge Main, said on p. 669:

"The general rule, which is well recognized, is to the effect that, where a person with actual or constructive knowledge of facts induces another, by his words or conduct, to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice."

I can hardly conceive of a case to which the rule thus announced would more aptly apply than the case at bar. With the knowledge that appellant was headed for a receivership, the respondent, by his words and

conduct, in fact, by his express agreement, acquiesced in, ratified and adopted a transaction that took the business of the appellant out of its immediate control and placed it in the hands of a trust company, which is now administering the trust. The respondent is now permitted, by the majority opinion, to alter his decision, repudiate the transaction, and do the very thing that he himself was anxious to obviate. He is permitted to impose his will upon all other unsecured creditors, who are satisfied with the present arrangement and who still share the belief, which he himself at one time also entertained, that a receivership would be unwise and expensive. Respondent, by altering his decision, compels all of the other creditors to alter theirs against their own will.

The prevailing opinion assigns as another, and apparently as the primary, reason for the appointment of a receiver, the fact that such appointment is necessary in order to make available certain assets ''which the trustee has no power or legal right to collect.'' In my opinion, this conclusion of the majority begs the whole question. The assets referred to consist of the liability, *if any,* of stockholders for unpaid subscriptions, and the liability, *if any,* of the trustees of the appellant for the unlawful declaration and payment of dividends. But there is no showing in the record that there *is* any such liability, and the trial court *expressly* refused to make any ruling to that effect. In the opening remarks of the court's oral decision at the conclusion of the evidence, the following language was used:

''The case when first presented to the court was somewhat confusing, and my first thought was I would be compelled to pass on the question of stockholders' liability for unpaid subscriptions, if any, for liability for the distribution of the dividend in December 1929.

I am persuaded now that in this proceeding, at least, that is not a matter for adjudication. And being persuaded further that the plaintiff is entitled to its judgment, I have but the one question, it seems to me, for disposition and that is, is he entitled likewise to have a receiver appointed, it being admitted that the corporation is insolvent.''

It is apparent, therefore, that the majority are deciding a question that the trial court did not pass upon, but expressly declined to decide. Whether, as a matter of fact and of law, there were such liabilities, was a question that might have been determined in this proceeding had the proof warranted it, and it may still be established in some other proceeding, if the proof warrants it. But such liabilities have certainly not yet been established, nor even brought forward to such a degree of probability as to make the appointment of a receiver a justifiable disposition of the case as a whole.

Under the conclusion reached by the majority, the interests of the creditors are to be sacrificed, or at least jeopardized, merely for the purpose of affording a single dissatisfied creditor an opportunity of inquiring whether possibly other assets do exist. Should that inquiry succeed, it will have accomplished nothing that could not be accomplished in a direct proceeding brought by any creditor for that specific purpose. Should the inquiry fail, much of what has already been done will have become abortive and the assets of the appellant, as now conserved, will have been frittered away in extensive and expensive litigation. The loss or expense, whatever it may be, will not be confined to the respondent, but will have to be borne by the entire body of creditors, who, with the exception of the respondent, appear to be satisfied with the present arrangement.

516

I think that the case should either be dismissed entirely, or, at most, should be remanded to the trial court to hear, consider and pass upon the question whether there *is* any liability, either on the part of the stockholders for unpaid stock subscriptions, or on the part of the trustees of appellant for unlawful declaration and payment of dividends, thus necessitating the appointment of a receiver for the limited purpose thereby required.

I therefore dissent from the conclusion reached in the majority opinion.

[1]Reported in 25 P. (2d) 102.